1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GAYLIN LYNN BURLESON,                    No. C 05-1263 SI (pr)

              Petitioner,          **ORDER DENYING HABEAS**
                                         **PETITION**

   v.

SCOTT KERNAN,

              Respondent.
_____/

**INTRODUCTION**

     This matter is now before the court for consideration of the merits of Gaylin Lynn Burleson's pro se petition for writ of habeas corpus. For the reasons discussed below, the petition will be denied.

**BACKGROUND**

A.    The Crimes

     The evidence of the crimes was described in the California Court of Appeal's opinion.

        From 1989 until the time of trial, Jane Burleson worked as a Deputy Public Defender in Solano County. Before she joined the Solano County Public Defender's Office, she practiced law in Contra Costa County. Jane met Burleson in October 1985, when he was incarcerated in state prison. They developed a relationship and were married in April 1987.

     *I.    Uncharged Domestic Violence Incidents*

        Jane was permitted to have unsupervised conjugal visits with Burleson in the prison. During one such visit in 1990 or 1991, as they were beginning to have sexual relations, Burleson became angry. He jumped up, told Jane she was the "worst lay he ever had," and complained she did not do what he wanted or care how he felt. Burleson

then made Jane "turn over on the bed," and he beat her on the buttocks, back and thigh with one of her shoes. Later, still angry with Jane, Burleson took a serrated bread knife from the visiting room's kitchen and held it to her throat. Jane screamed but stopped when Burleson told her to "shut the fuck up." Jane did not report the incident because she did not want Burleson to be disciplined by prison authorities or prosecuted, and she feared he would retaliate. He also apologized afterward, telling Jane "he wouldn't have to do those things" if she would listen, pay attention, be "a good wife," and obey him.

Burleson was released from prison in July 1993 and came to live at Jane's house. He did not work, and the couple lived on Jane's salary. Around this time, Jane's friends and colleagues noticed a change in her physical appearance and personality. Whereas she had been outgoing and effective as an attorney, she became progressively more withdrawn and distracted. She sometimes came to work with bruises, or wearing excessive makeup and dark sunglasses, or walking very gingerly, as if she were in pain. Although she denied it at the time, Jane's coworkers believed Burleson had been beating her.

At trial, Jane testified violent episodes occurred "very regularly" after Burleson moved in with her. Once, when they were having a conversation, he said, "get off me" and pushed Jane into a wall. He then dragged her into the bedroom and slapped her face. In September 1993, shortly after Burleson's release from prison, Jane came to an office birthday party displaying signs of serious injuries. She had very obvious bruising on her face and had difficulty walking, sitting and standing. Her breathing was labored and she appeared to be in great pain, especially in her rib area. Upon seeing her condition, Jane's colleague Peter Foor, now a judge of the Solano County Superior Court, insisted on taking her to a hospital. Jane confided to Foor that her husband had beaten her severely, but she told hospital personnel she had fallen down and hit her side. Jane testified she did not tell the doctor the truth because she feared Burleson would be sent back to prison or would be angrier with her.

On October 9, 1993, Jane and Burleson drove to a cabin near the town of Chester, in Plumas County, to begin a planned three-week vacation together. Burleson had been complaining of pain in his shoulder. He "self-medicated" with methamphetamine and marijuana and frequently asked Jane to massage the area. The morning after they arrived at the cabin, while they were having coffee in bed, Burleson asked Jane for a massage. She agreed, but took a couple sips of coffee before she began massaging him. Burleson "became furious." He said, "When I want you to do something, I want you to do it now," and he hit Jane repeatedly in her shoulder, chest and head. After Burleson ordered her to put ice on her swelling face, Jane did so and then resumed massaging his shoulder. Later that night, Burleson asked for oral sex but became displeased at how Jane performed it. He grabbed her by the hair, pulled her head back, and hit her so hard she saw stars. Jane recalled saying, "Gaylin, you broke my face." The blow re-chipped a tooth that had previously been repaired. Burleson continued to punch Jane in her head and upper body, causing severe facial swelling, black eyes, and drainage from one of Jane's ears. Later, Burleson alternated between telling Jane he was sorry and saying she "had it coming."

Jane's injuries were too noticeable for them to leave the cabin the next day (a Monday). On Tuesday, Jane complained of pain and began vomiting, but Burleson insisted she stop because there was "nothing wrong" with her. He continued to use methamphetamine and grew angry with Jane again, saying she "wasn't a good wife, . . . wasn't listening to him, . . . wasn't cooking the way he wanted . . . [and] . . . wasn't showing him that [she] loved him." While yelling at her, Burleson punched, slapped, poked and kicked Jane. He eventually picked up a kitchen utility knife with an eight-to-ten-inch blade. While standing in front of Jane, Burleson tossed the knife from one hand

United States District Court
For the Northern District of California

1

2

to the other and said that while he was in prison he had fantasized about killing her. He held the knife to Jane's neck but did not actually cut her. Jane testified she felt she could not run away or otherwise protect herself in that situation.

3

4

5

6

7

8

9

10

11

The week in Plumas County continued with more violent incidents. One morning, as they drove down a muddy trail, Burleson told Jane "he could kill [her] and throw [her] anywhere in that county and nobody would ever find [her]." During a drive on Thursday, Burleson pulled off the road and began ranting at Jane, saying he was trying to save their marriage and insisting they "wouldn't have these problems" if she would listen and pay attention and "be a good wife to him . . . ." While they sat in the truck, Burleson punched Jane several times in the arm. He then told her to get out of the truck and walk with him into the woods. Jane did not want to go, thinking Burleson would kill her, but she followed him because she was afraid to disobey. Burleson eventually ordered her to sit on a log when they were in a secluded area in the woods. He paced in front of Jane and asked if she understood what it felt like to be "totally alone." He said, "That is how you make me feel." Then, he knelt in front of Jane, looked in her eyes and said, "This is finality." Jane thought Burleson was about to kill her, but he eventually rose and asked, "Do you want to save this marriage?" When Jane said she did, they returned to the truck. As they drove back to the cabin, Burleson reminded Jane, "I could kill you and drop you anywhere. Nobody would find you."

12

13

14

15

16

17

18

On Friday, Burleson again complained of pain in his shoulder and continued using methamphetamine. He told Jane he would want oral sex that night and warned her he would kill her if he did not like the way she performed it. He beat Jane severely that day. At one point, Burleson forced Jane to kneel before him while he tossed the kitchen knife back and forth. He then presented the knife to Jane, ordering her to take it and telling her, "You could kill me." Fearing Burleson was trying to trick her, and would disarm her and kill her if she obeyed, Jane refused to take the knife. After this incident, Burleson grew withdrawn. Calling Jane a "hostage," he refused to take her home. That night, he told her he would kill her if she did not perform oral sex to his liking. Jane believed he truly intended to kill her, so she ran away from the cabin, wearing only a T-shirt, underwear and moccasins, while Burleson waited for her in the bedroom. She got lost in the dark and rain, but eventually reached a motor home. The occupants let her in, gave her some pants, and drove her to a hotel in town.

19

20

21

22

23

24

25

Jane did not call the police because she feared Burleson would be arrested for a parole violation, which she knew could send him back to prison for only one year, and she feared what he might do to her when he was released. Part of her also did not want Burleson to have to go back to prison at all. Instead, she called some friends. Jane's friend Vicki Cordova and her husband drove up to the hotel to pick up Jane. Jane was wet, muddy and badly bruised, with messy hair and two black eyes. After determining Burleson had left the cabin, Jane retrieved her belongings and rode with the Cordovas back to the Bay Area. Upon their return, Vicki Cordova photographed Jane's injuries. Jane later called Burleson to tell him she was safe and had not reported the incident to police or parole authorities. He expressed remorse and begged Jane to come back, crying and promising he would never hit her again. Jane believed him and persuaded Abe Cordova to drive her back to her home in Martinez. When Jane returned home and talked with Burleson, he said he "[had] to take that promise back" about not hitting her, but she could avoid future beatings by listening and "being a good wife."

26

27

28

The couple then drove to Monterey County to continue their vacation. One night, Burleson's back hurt, and he asked Jane to jump on his back. She hesitated, afraid of hurting him, and Burleson became angry because she would not obey him. He pushed Jane, punched her in the arm and chest, and dragged her out of bed by her hair. Holding her bruised face up to a mirror, Burleson forced her to look at herself and asked, "Would you

want to fuck that?" After a stop in Carmel, the couple took a public tour of Hearst Castle in San Simeon. When they were surrounded by people, Jane told Burleson she had decided to leave him. However, Burleson convinced her to get into the truck with him to drive back home together.

When Jane returned to work, she confided in coworker Harry ("Ike") Isnor. In Isnor's presence, she tape-recorded a long narrative describing the "nightmare" events in Plumas and Monterey Counties. Jane testified she had become increasingly afraid Burleson would kill her, and she wanted people to know what had happened if she died. Later in November, when Burleson became angry about Jane's plan to have her parents visit on Thanksgiving, Jane contacted his parole officer, Joseph Kimmel, who arrested Burleson. Jane had not wanted Burleson to be arrested, and she feared he would become violent when he was released from custody. She therefore told Kimmel she was not afraid of Burleson and nothing had happened between them in Plumas County. Jane repeated this story at Burleson's parole revocation hearing. At the hearing, Jane testified her injuries resulted from a car accident. At trial, Jane described the accident in which Burleson backed his truck into her car, but she said she was nowhere near the car when it happened.

After Burleson was released from custody, the abuse continued. He punched Jane in the face when he misunderstood her reaction to his Valentine's Day present. He then began hitting Jane on a regular basis, about once every two weeks. Finally, one night in September 1994 when Burleson appeared in an especially dangerous mood, Jane fled the house, taking nothing but her purse and car. Jane moved into an apartment. She did not tell Burleson where she was living at first, but did give him her phone number. Eventually, Jane revealed her new address to Burleson and agreed to spend weekends at home with him. Their relationship proceeded well at first, but shortly before Christmas Burleson hit Jane, giving her a black eye. Later that month, when Jane was in the middle of defending a client in a murder trial, Burleson beat her "very, very severely," causing black eyes, bruised and swollen arms and a bruised chest. Her injuries were so severe that she had to seek medical attention and could not return to the trial for a week. Jane told the doctor she had slipped while walking on a dock to a houseboat. Slowly, at Burleson's insistence, Jane moved back into the house with him.

## II.    Facts Relating to Charged Offenses

One Saturday in late January 1995, Jane spent the day at a continuing education seminar in Sacramento. When she returned that evening, Burleson was in a sullen mood. Burleson had a long telephone conversation with his friend Butch Wright and, afterward, became very angry with Jane, accusing her of patronizing Wright and his wife. During this rant, Burleson approached Jane and slapped her so hard she rolled backwards in her chair and hit her head against the wall. He then held a paring knife under Jane's eye and said, "I want you to tell me who you been fucking." If she did not, Burleson threatened to run the knife into her brain. Although she was very frightened, Jane responded he would have to do it because she had nothing to tell him. Burleson eventually put the knife down but remained angry. He ordered Jane to finish her drink and then drink two more glasses full of straight vodka. After she did so, he ordered her to call Wright and apologize for treating him with disrespect. He then made Jane call her parents and tell them she had lied to them and been irresponsible with money and that Burleson had been "a big assistance to [her] financially while he was in prison." After the phone calls, Burleson forced her to take a walk, have a cold shower and go to bed.

About 15 minutes later, Burleson came into the bedroom yelling that Jane's father did not treat him with appropriate respect. He left again, but soon returned holding a butcher knife. He leaned across the bed and grabbed Jane by the throat, pressing the tip

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1
2
3

of the knife against the right side of her chest. Inches from Jane's face, Burleson looked into her eyes and said, "'I'm going to kill you.'" Jane was convinced she was about to die. Burleson then raised the knife high and brought it down three inches away from her thigh, embedding it deep in the mattress. He removed the knife and said, "I could have killed you," then got into bed and went to sleep.

4
5
6
7
8
9

The next morning, although Jane had bruises on her neck where Burleson had choked her, they went to a friend's Super Bowl party. To hide the bruises, Jane wore heavy makeup and a high-necked blouse. While driving to the party, Jane and Burleson talked about the previous night. Burleson apologized and said he loved her. Jane said she loved Burleson too, but secretly planned to leave him once the weekend was over. On Monday morning, Jane called Burleson from the office and told him she was leaving him. She could hear him breaking things in the house. The next day, after she learned Burleson had left, Jane returned to the house with a police escort. The house was clean, but most of Burleson's clothes were gone, as was the mattress. Jane hired a locksmith to change the locks on the house and later moved back in. At Jane's request, private investigator Paul Fait moved into the house as well, to "make sure [she] was safe."

10
11
12
13
14
15
16
17
18
19
20
21

Burleson first called Jane to discuss money. He told her he had obtained approximately $18,000 in cash advances from their credit cards. He planned to move away and "start over," and he promised to help pay back the money after he "got himself established." In Burleson's next phone call, he told Jane he would cooperate in filing for divorce. Although these initial calls were businesslike, they grew progressively more threatening. Now living in South Dakota, Burleson began phoning Jane at all hours of the day and night. He threatened to kill Jane in extremely gruesome ways and sometimes threatened to kill and dismember her parents. Knowing Burleson had a prior murder conviction and a history of violence, Jane believed he intended to carry out his threats, and she feared for her life. However, she did not immediately report the threatening phone calls to the police. Instead, at a coworker's suggestion, Jane began tape-recording the calls. Based on the frequency of the calls and the violence of Burleson's threats, Jane believed he would return and kill her. The tapes were made, she explained at trial, so people would know what had happened if she died. Sometimes Jane recorded the entire telephone conversation; other times she recorded only the threatening portions. She gave each completed tape to Paul Fait for safekeeping and to avoid any claim she had "doctored" the recording.[1] After one particularly threatening call, Jane became convinced "it was only a matter of time" before he killed her or paid someone to kill her. She therefore typed a letter stating that, if she were killed, she did not want her killer to receive the death penalty. She kept this letter in her desk at work and eventually gave it to her divorce lawyer. Finally, Jane contacted Burleson's parole officer and the police. They immediately obtained a "'no bail'" arrest warrant and eventually located Burleson (in South Dakota) by tracing his telephone calls to Jane.

22
23
24
25

Based on the events in January through March of 1995, Burleson was charged with inflicting corporal injury on a spouse (Pen. Code, § 273.5), two counts of assault with a deadly weapon or by force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)), stalking (Pen. Code, § 646.9, subd. (a)), and making terrorist threats (Pen. Code, § 422). The information also alleged enhancements for personal use of a knife and three prior serious felony convictions (for a murder and two robberies).

26
27
28

---

[1] The record on appeal includes transcripts of 12 tapes, recorded March 7, 1995 through March 16, 1995. . . . Suffice it to say these pages are filled with vulgar insults, obscenities and gruesome threats uttered by Burleson--primarily against Jane.

III.     *Defense Case*

Burleson represented himself at trial.  He called the emergency room physician who examined Jane in 1993, when Peter Foor took her to the hospital.  The doctor diagnosed a rib cage contusion based on Jane's report that she had fallen against an object, but there were no rib fractures and he did not observe swelling or bruising. Burleson also called an accident reconstruction expert, who reenacted the collision that occurred when Burleson backed his truck into Jane's parked car.  He testified that the injuries depicted in Vicki Cordova's photographs of Jane could have been caused by this accident if Jane were sitting in or exiting her car when it was struck.  A forensic pathologist drew the same conclusion, based on her review of the accident reconstruction expert's report and Cordova's photographs. She also testified the bruises photographed appeared to be older than Jane had reported.  Another witness, the brother of Burleson's friend, testified that Jane told him she was injured when Burleson backed his truck into her car.  Burleson also called three witnesses from the Super Bowl party in January 1995. Each said they had observed no sign that Jane was injured or had been assaulted by Burleson the previous night.

With regard to the tape-recorded phone calls, audiotape expert Fausto Poza testified that magnetic markers on some of the tapes indicated they were not produced by Jane's machine.  Poza also believed some portions of the tapes had been recorded over, and he noted interruptions in the taping process.  Defense expert Samuel Benson, M.D., also testified about the tape-recorded phone calls.  A psychiatrist with experience treating prison inmates, Dr. Benson explained prison inmates often use vulgar, hostile language to communicate with each other.   Their threats are usually not meant to be taken seriously; rather, inmates often use threats and intimidation as a coping mechanism to avoid true confrontation.   According to Dr. Benson, Burleson exhibits borderline narcissistic, depressive and antisocial personality traits, which are exacerbated when he is intoxicated.  He believed the threatening phone calls were not a prelude to violence, but expressions of Burleson's feelings of anger and fear of abandonment, especially given Burleson's belief that Jane was sleeping with the investigator who was staying in the house.  Dr. Benson also testified Jane did not fit the profile of a typical battered woman. On the contrary, she struck Dr. Benson as the one who was "in charge" of the relationship.  Dr. Benson thought the tape-recorded conversations showed evidence that Jane could "manipulate" Burleson.

In its rebuttal case, the prosecution called the original district attorney assigned to the case and Jane's divorce attorney.  Each testified that, contrary to insinuations made by the defense, Jane had never expressed a desire to use Burleson's criminal prosecution as leverage to obtain a more favorable divorce settlement.

The jury acquitted Burleson of count one (inflicting corporal injury on a spouse), but found him guilty of the lesser included offense of battery.  The jury found Burleson guilty of all other crimes charged and found true the allegations of knife use and prior serious felony convictions.  The court sentenced him to a term of 40 years to life in prison, imposed a restitution fine of $ 18,000, and ordered him to pay restitution to Jane in an amount to be determined.

Cal. Ct. App. Opinion, pp. 1-10.

B.    <u>Case History</u>

On February 10, 2000, Burleson was convicted in a jury trial in Contra Costa County Superior Court of battery, two counts of assault with a deadly weapon and by means likely to cause great bodily injury, one count of making terrorist threats, and one count of stalking.  The jury found true the allegations that Burleson had used a knife during the assaults and that he had prior serious convictions for murder and two robberies, <u>see</u> Cal. Penal Code §§ 667(a), 1170.12(b).  He was sentenced to a term of 40 years to life in state prison on April 26, 2000.

Burleson appealed.    The California Court of Appeal affirmed the judgment and the California Supreme Court denied his petition for review.  Burleson's state habeas petitions were denied.

Burleson then filed his federal petition for a federal writ of habeas corpus.  His petition alleged twelve cognizable claims.  The court ordered respondent to show cause why the petition should not be granted.  Respondent filed an answer and Burleson filed a traverse.  (About 18 months after he filed his traverse, Burleson requested a stay so that he could return to state court to exhaust state court remedies for a claim concerning his sentence.  In a separate order, the court denies that request.)  The matter is now ready for a decision on the merits.


**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in Contra Costa County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).


**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

**United States District Court**
For the Northern District of California

1    highest state court available with a fair opportunity to rule on the merits of each and every claim

2    they seek to raise in federal court.  <u>See</u> 28 U.S.C. § 2254(b), (c).  The parties dispute whether

3    Burleson exhausted his state judicial remedies as to his claim that his sentence was illegal.  The

4    court may deny, but not grant, relief on a habeas petition that presents an unexhausted claim.

5    <u>See</u> 28 U.S.C. § 2254(b)(1).  The district court can deny an unexhausted claim "only when it is

6    perfectly clear that the applicant does not raise even a colorable federal claim."  <u>Cassett v.</u>

7    <u>Stewart</u>, 406 F.3d 614, 623-24 (9th Cir. 2005), <u>cert. denied</u>, 546 U.S. 1172 (2006).

8

9                                          **STANDARD OF REVIEW**

10          This court may entertain a petition for writ of habeas corpus "in behalf of a person in

11    custody pursuant to the judgment of a State court only on the ground that he is in custody in

12    violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The

13    petition may not be granted with respect to any claim that was adjudicated on the merits in state

14    court unless the state court's adjudication of the claim: "(1) resulted in a decision that was

15    contrary to, or involved an unreasonable application of, clearly established Federal law, as

16    determined by the Supreme Court of the United States; or (2) resulted in a decision that was

17    based on an unreasonable determination of the facts in light of the evidence presented in the

18    State court proceeding."  28 U.S.C. § 2254(d).

19          "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

20    arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or

21    if the state court decides a case differently than [the] Court has on a set of materially

22    indistinguishable facts."  <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 412-13 (2000).

23          "Under the 'unreasonable application' clause, a federal habeas court may grant the writ

24    if the state court identifies the correct governing legal principle from [the] Court's decision but

25    unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u> at 413. "[A] federal

26    habeas court may nor issue the writ simply because that court concludes in its independent

27    judgment that the relevant state-court decision applied clearly established federal law

28

                                                            8

United States District Court
For the Northern District of California

1   erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

2   federal habeas court making the "unreasonable application" inquiry should ask whether the state

3   court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

4

5                                         **DISCUSSION**

6          Many of Burleson's legal claims relate to certain audiotapes made by his wife, Jane, of

7   telephone conversations between them.   The disputes about testing the tapes pertain to

8   examination of the methods Jane used to make the recordings (e.g., starts and stops, over-

9   recordings and erasures) and not whether Burleson actually made the statements on them.

10  Burleson admitted that he made the abusive and threatening statements that were recorded,

11  although he claimed that the tapes had been altered to show what had prompted the outbursts and

12  that Jane was not actually fearful at hearing his lengthy diatribes, see RT 2795, notwithstanding

13  his numerous threats to kill her, her mother and her father as well as his graphic descriptions of

14  how he would kill each of them, see RT 2770-2789.  The prosecutor did not contend that the

15  tapes were a continuous recording of the telephone calls; he acknowledged that Jane had

16  recorded only parts of some conversations, sometimes because of equipment problems and

17  sometimes when the conversations had nothing to do with Burleson's threats.  RT 2766.

18

19  A.     Claims Concerning Assistance of Counsel at Trial Court Level

20         Burleson contends that the denial of his two Marsden[2] motions against attorney Spencer

21  Strellis violated his rights to due process and to assistance of counsel.  Attorney Strellis was the

22  fourth attorney appointed to represent Burleson during the criminal case which took five years

23  to get to trial and eventually was tried with Burleson representing himself.  Burleson had filed

24  Marsden motions against his first attorney before Strellis and another attorney after Strellis, but

25  the only Marsden rulings he challenges in his habeas petition are the rulings on his two Marsden

26  ────────────────

27         [2]People v. Marsden, 2 Cal. 3d 118 (1970), requires the California trial court to permit a
    criminal defendant requesting substitution of counsel to specify the reasons for his request and
28  generally to hold a hearing.

1   motions against attorney Strellis.

2   The Sixth Amendment grants criminal defendants who can afford to retain counsel a

3   qualified right to hire counsel of their choice.  See Wheat v. United States, 486 U.S. 153, 159,

4   164 (1988).   A criminal defendant who cannot afford to retain counsel has no right to counsel

5   of his own choosing.  See id.  Nor is he entitled to an attorney who likes and feels comfortable

6   with him.  The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful

7   relationship" between an accused and his counsel.  See Morris v. Slappy, 461 U.S. 1, 14 (1983).

8   The essential aim is "to guarantee an effective advocate for each criminal defendant rather than

9   to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."

10  Wheat, 486 U.S. at 159.

11  Nonetheless, to compel a criminal defendant to undergo a trial with the assistance of an

12  attorney with whom he has become embroiled in irreconcilable conflict is to deprive the

13  defendant of any counsel whatsoever.  Daniels v. Woodford, 428 F.3d 1181, 1197 (9th Cir.

14  2005).  "[N]ot every conflict or disagreement between the defendant and counsel implicates

15  Sixth Amendment rights." Schell v. Witek, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc).  The

16  denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to

17  counsel and is properly considered in federal habeas.  See generally Schell, 218 F.3d at 1024-25.

18  The "ultimate constitutional question" on federal habeas review is whether the state trial court's

19  denial of the Marsden motion "actually violated [the defendant's] constitutional rights in that the

20  conflict between [the defendant] and his attorney had become so great that it resulted in a total

21  lack of communication or other significant impediment that resulted in turn in an attorney-client

22  relationship that fell short of that required by the Sixth Amendment." Schell, 218 F.3d at 1026.

23  In accord with the dictates of the Sixth Amendment and Marsden, the trial court inquired

24  into Burleson's concerns.  See Hudson v. Rushen, 686 F.2d 826, 831 (9th Cir. 1982) (state court

25  conducted adequate hearing when it invited defendant to make a statement and listened to

26  defendant's reasons for wanting new counsel).  The trial court made a thorough inquiry into both

27  of Burleson's motions. RT 632-773, 807-844, 1317-1381; see also RT 1542-1573 (Burleson's

28

10

**United States District Court**
For the Northern District of California

Marsden presentation regarding Strellis continuing even after he is representing himself).

The first Marsden motion was heard on March 12, 1997.  At that hearing, Burleson complained at length about Strellis' performance in the hearing on the motion to suppress the audiotapes Jane had recorded.  He also complained, among other things, that Strellis had not done an adequate investigation of the tapes of the telephone conversations, had not arranged for a Battered Woman's Syndrome expert or a medical expert (to possibly testify that Jane's photographed injuries could be consistent with a car accident) or a psychiatric expert (to possibly testify about Burleson's behavior and intoxication during telephone conversations), and had not investigated witness Paul Fait[3] and his relationship with Jane.  Eventually, when Burleson launched into a diatribe about a conspiracy (comprised of his defense attorneys, his divorce attorney, the district attorney and the court) working to put him in prison and protect his ex-wife's career, RT 749-762, defense counsel expressed concern over Burleson's apparent paranoia and moved under Penal Code § 1368 to have his competency to stand trial evaluated.  After allowing defense counsel and Burleson a moment to confer – apparently to figure out whether Burleson had just been engaging in hyperbole – and when counsel then reiterated his request for a § 1368 evaluation, the court vacated the trial date, suspended the proceedings, and referred Burleson for psychological testing.

The Marsden hearing was reconvened on April 25, 1997, after the appointed psychologist found Burleson competent.  Burleson again expressed his belief that Strellis was working with the district attorney and court to damage his defense and protect Jane from prosecution.  The trial court denied the first Marsden motion on May 1, 1997.  The trial court "observed Burleson appeared to view himself as the 'captain' of his defense team.  He thus became frustrated when his attorneys and investigators, whom he viewed as 'subordinates,' did not carry out all his orders regarding how the defense should be conducted.  The court believed the lack of trust emanated from Burleson's disposition, rather than from any failure by Strellis to provide adequate

---

[3]Although Burleson complained that the attorney did not pursue Paul Fait, the defense investigator had just testified that Fait refused to return telephone calls so they had subpoenaed him.

United States District Court

For the Northern District of California

representation." Cal. Ct. App. Opinion, p. 13.  The trial court postponed the trial date.  Although Burleson objected, the trial court found good cause for the postponement based on Strellis' unavailability due to his obligation to try a death penalty case in another county until September 1997 and the court's inability to find another attorney prepared to try the case in the interim.  The court set a new trial date of September 15, 1997.  In late August 1997, Burleson filed (through specially appointed counsel) an unsuccessful motion to dismiss due to a denial of his speedy trial rights and filed a pro per motion to challenge the trial judge for cause under California Code of Civil Procedure § 170.1.  The trial date was later moved to January 1998.

On December 18, 1997, Burleson filed his second Marsden motion against attorney Strellis.  He complained that Strellis had not arranged for defense expert Poza to conduct full testing of the audiotapes to show that there were gaps and erasures and other problems with the recordings.  Burleson said Strellis was not advocating aggressively enough with regard to certain motions, had not adequately prepared the defense, and was working in Jane's best interests instead of Burleson's.  The trial court denied the motion and said that Strellis and his co-counsel Krech appeared prepared for trial that was then more than two weeks away.[4]  The trial court determined that the "asserted breakdown in this attorney-client relationship was due solely to Burleson's mindset, i.e., his inability to be satisfied with work performed by anyone else, [and] the court found no grounds for granting Marsden relief."  Cal. Ct. App. Opinion, p. 14.

The California Court of Appeal rejected Burleson's claims that the trial court had erred in denying his motions to substitute appointed counsel.  The appellate court determined that Burleson's "complaints do not rise to the level of constitutionally inadequate representation, nor do they signal a fundamental breakdown in attorney-client relations."  Cal. Ct. App. Opinion, p. 15.  The court found that Strellis had not been ineffective in preparing for trial, that there was evidence at the first hearing that showed "the defense team had completed a great deal of work

---

[4]Strellis did not say that he was trial-ready that day; rather, he said he expected to be ready as of the January 5, 1998 trial date.  RT 1353.  As the trial court noted , it is commonplace for the majority of trial preparation to take place as the trial date is imminent.  RT 1357.

United States District Court
For the Northern District of California

in preparing the case for trial," and that Burleson's complaints about the testing of the audiotapes "have questionable support and, at best, amount to a disagreement over trial strategy." Id. at 16. The appellate court saw Strellis' decision not to further test the tapes at the time not inadequate in light of the record at the second Marsden hearing, where "Strellis told the court he had retained an expert to testify about the tapes' authenticity, and he admitted he hoped the expert would give him an 'astronomical' estimate for testing (presumably so the defense could rely on this estimate, in limine or on appeal, to argue that the tapes should be excluded). But Strellis explained the defense expert told him 'he would not do the work,' and the other expert who examined the tapes for the defense had reached conclusions that were unfavorable." Cal. Ct. App. Opinion, p. 16.[5]

The state appellate court also rejected Burleson's argument that the Marsden motion should have been granted because Strellis had an existing commitment to represent another client in a death penalty trial. That court found unsupported Burleson's accusation that Strellis concealed this obligation; instead, Strellis advised Burleson and the trial court of the scheduling problem without undue delay once he learned of it. Also, the state court of appeal noted that a trial date in a death penalty case is not set in stone and frequently gets continued. Burleson was not abandoned during Strellis' death penalty case: co-counsel Krech was able to argue several pretrial motions and the defense investigators continued working on the case.[6] That was Strellis' plan, not happenstance.

After rejecting the arguments that there were inadequacies in Strellis' performance, the

_____

[5]Burleson disputed the attorney's statement that the expert did not want to do the work. As Burleson's own investigator stated at a later hearing, the expert had to be coaxed into doing further work. See RT 1566. The trial court reasonably observed that the investigator's comments demonstrated the expert was at least initially unwilling to do the work. RT 1571.

[6]Burleson asks this court to take judicial notice of the death penalty case file and another state court case file. Petition, pp. 158, 238 n.14. The requests are denied. Judicial notice is not a way to get a court to do evidence-gathering and photocopying for a litigant. This court does not have ready access to other courts' files, and expects a party to place in the record for this case everything he wants this court to consider. (This court has, however, reviewed Burleson's Exhibits H-J that came with his petition and are copies of documents from the Harris case.) Also, a party asking this court to take judicial notice needs to explain what he wants this court to judicially notice and the purpose for doing so.

**United States District Court**
For the Northern District of California

1    appellate court turned to the real problem: Burleson's attitude.  The state appellate court rejected

2    the argument that there was an irreconcilable breakdown in the relationship between attorney

3    and client requiring replacement counsel. The client's distrust alone is not sufficient to require

4    substitute appointed counsel and a trial court is not required to conclude there is an irreconcilable

5    conflict "if the defendant has not made a sustained good faith effort to work out any

6    disagreements with counsel and has not given counsel a fair opportunity to demonstrate

7    trustworthiness."  Cal. Ct. App. Opinion, p. 17 (citation omitted).  "The trial court did not abuse

8    its discretion in determining Burleson had not made a sustained good faith effort to work with

9    Strellis.  The record of Burleson's <u>Marsden</u> motions against Strellis and earlier counsel amply

10   supports the court's finding that Burleson became dissatisfied with any attorney who disagreed

11   with him on strategic matters." <u>Id.</u> at 17-18.  The court of appeal concluded that, "to the extent

12   there was a breakdown in trust and communication between this attorney and client, the record

13   suggests the breakdown emanated entirely from Burleson's truculent attitude."  <u>Id.</u> at 18.

14          This court reaches the same conclusion.  Burleson was extremely demanding of attorneys,

15   and refused to yield to any lawyer's judgment, even on matters of trial strategy, if he disagreed

16   with it.  Burleson's unwillingness to let the lawyer make tactical determinations was not a

17   legitimate reason to compel appointment of new counsel, <u>see</u> <u>Schell v. Witek</u>, 218 F.3d at 1026

18   & n.8, especially when there was no reason at all to expect that the same problem would not

19   arise again with new counsel.  Burleson's desire to micro-manage his case and to override his

20   attorney's strategic decisions was evident repeatedly at the <u>Marsden</u> hearings.  One example

21   illustrates the degree to which he wanted to maintain control of everything: he was annoyed that

22   counsel refused to pursue perjury charges against Jane and did not intend to accuse her at trial

23   of perjuring herself.  Even calling her a liar apparently wouldn't have been enough for Burleson.

24   RT 1348, 1361.[7]

25

26          [7]Burleson fails to appreciate that if there was a genuine perjury concern for Jane, his
27   attorney's ability to develop that at trial was quite limited.   A judge often takes action when a
     witness has a perjury concern.  <u>See, e.g.</u>, <u>Webb v. Texas</u>, 409 U.S. 95, 98 (1972).  Burleson was
28   irritated about his attorney's failure to commit to push Jane on this point:  "I asked him if he was

United States District Court
For the Northern District of California

The state court's determinations that counsel was performing adequately and that no irreconcilable conflict existed were not unreasonable.  In light of the information provided at the hearings, it was not unreasonable for the trial court to think that Burleson's frustration with any appointed counsel's exercise of his professional judgment would continue with new counsel and therefore did not warrant appointing a fifth attorney to represent Burleson.  Appointment of new counsel wouldn't end the frustration that was more a product of Burleson's truculent attitude and controlling demeanor rather than counsel's behavior.  Burleson was on this fourth attorney and admitted he had started making a record for appeal in anticipation of a <u>Marsden</u> problem within a few months of Strellis' initial appointment,  RT 742, indicating his predisposition to find fault with counsel.  And Burleson was accusing the trial judge of "intentionally trying to walk on me and prevent me from presenting the defense available to me."  RT 761; <u>see</u> RT 742, 746, suggesting that he would see <u>any</u> attorney appointed by that judge to be part of a plot to prevent him from presenting a defense.  Burleson also had made up his mind that an attorney from the state defender's office had to be appointed for him and was irritated at one superior court judge's refusal to bypass the conflicts panel list; indeed, that caused him to file a <u>Faretta</u> motion.  <u>See</u> CT 338.

Bearing in mind that the "purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial,'" <u>Wheat</u>, 486 U.S. at 159, this court sees no evidence

---

going to admonish my wife whenever she gets ready to commit perjury on the stand.  He said, No. [¶] I'm not going to let him do it.  I'm not going to let him take control of this case and flush me down the toilet."  RT 1348.  Many of Burleson's comments reflected his belief that his appointed counsel's job was not just to obtain an acquittal for Burleson but also to crush his ex-wife.  Not only is the latter not a legitimate attorney task, it is an extremely risky ploy.  There is a substantial downside potential in verbally pummeling a domestic violence complainant in the courtroom, especially in a case where there are literally hours of recorded conversations in which the defendant has verbally berated and humiliated that same woman.

Burleson also had filed a <u>Marsden</u> motion against his first attorney, William Egan, on December 4, 1995, and one of the reasons for that motion was his irritation that Egan wasn't developing a case for a perjury prosecution of Jane.  <u>See</u> CT 280.  Egan's explanation about the tactical considerations relevant to the perjury issue apparently did nothing to abate Burleson's irritation.  <u>See</u> CT 297.  Burleson also made clear at the <u>Marsden</u> hearing for Egan that he was double-checking Egan's legal reasoning.  <u>See</u> CT 283.

that purpose went unfulfilled in this case or that a Sixth Amendment violation occurred. Burleson has not shown that counsel provided ineffective assistance on any particular matter. And he has not shown that there was an impediment that resulted in an attorney-client relationship that fell short of that required by the Sixth Amendment.   The California Court of Appeal's rejection of Burleson's claim was neither contrary to nor an unreasonable application of clearly established federal law as set forth by the U.S. Supreme Court.   Burleson is not entitled to the writ on this claim.

B.      Claims Concerning Assistance of Appellate Counsel

Burleson contends that he received ineffective assistance of counsel on appeal in that counsel failed to raise five allegedly meritorious issues that Burleson has identified and failed to <u>effectively</u> argue several of the allegedly meritorious issues that he did include in the appellant's opening brief.

The California Court of Appeal rejected the argument that appellate counsel was deficient in his appellate work:

> As if to prove his inability to be satisfied with any attorney, Burleson has filed a motion in this court seeking substitution of his appointed appellate counsel. . . .  Burleson claims his appellate counsel's performance is constitutionally deficient because the attorney (1) failed to raise all arguably meritorious issues on appeal, (2) failed to perfect the appeal, and (3) failed to communicate with him sufficiently.  We deny the motion.
>
> With regard to the first complaint, although counsel raises 13 issues in his 115-page opening brief, Burleson insists he should have raised an additional 13 issues as grounds for reversal.  First, we must correct Burleson's apparent misimpression of the role of appellate counsel.  Appellate counsel has no duty to raise every nonfrivolous issue suggested by the client.  (Jones v. Barnes (1983) 463 U.S. 745, 751-754; see also People v. Johnson (1981) 123 Cal. App. 3d 106 [appellate counsel need not raise a potentially "arguable" issue if, in counsel's opinion, the issue is unmeritorious].)  As the United States Supreme Court has observed, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  (Jones v. Barnes, supra, at pp. 751-52.)  With these principles in mind, we have reviewed the alleged errors described in Burleson's Marsden motion and conclude none appears to be "arguably meritorious" in that it has a "reasonable potential for success" and, if successful, would result in a reversal or a modification of the judgment.

Cal. Ct. App. Opinion, p. 19.  The state court of appeal listed the thirteen issues that Burleson faulted appellate counsel for not raising and explained briefly why each failed.  See id. at 19-20

16

**United States District Court**
For the Northern District of California

n.8.  The court also rejected as contrary to the evidence the arguments that counsel had failed to include parts of the record and had not communicated with Burleson.  Id. at 20.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  See Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are evaluated under the Strickland standard, i.e., a defendant must show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  Miller v. Keeney, 882 F.2d 1428, 1433-34 & n.9 (9th Cir. 1989) (citing Strickland v. Washington, 466 U.S. 668, 688, 694 (1984)).  Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant.  See Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Miller, 882 F.2d at 1434 n.10.  "The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy."  Miller, 882 F.2d at 1434.  See also Jones, 463 U.S. at 751-52. As the court in Miller explained:

> Like other mortals, appellate judges have a finite supply of time and trust; every weak issue in an appellate brief or argument detracts from the attention a judge can devote to the stronger issues, and reduces appellate counsel's credibility before the court. For these reasons, a lawyer who throws in every arguable point - "just in case" - is likely to serve her client less effectively than one who concentrates solely on the strong arguments.

882 F.2d at 1434.

The objective reasonableness of counsel's failure to pursue the claims on appeal depends upon the merits of the claims.  As mentioned by the California Court of Appeal in its footnote, the various claims would have failed for the reasons discussed therein.  Therefore, it was not objectively unreasonable for appellate counsel to not pursue them.  See Miller, 882 F.2d at 1434. For similar reasons, there was no prejudice.  There is not a reasonable probability that, but for counsel's failure to raise the claims, Burleson would have prevailed on appeal.  See Miller, 882 F.2d at 1434, n.9 (citing Strickland, 466 U.S. at 688, 694).

Not only were the claims not meritorious, but the inclusion of them would have added dozens of pages to an appellate brief that was already about twice as long as normally permitted

17

United States District Court
For the Northern District of California

under California Rule of Court 8.360.  In his federal habeas petition, Burleson has trimmed the number – from 13 down to 5 – of additional claims he alleges appellate counsel should have included in the opening brief but still spent 50+ pages arguing just those five claims.[8]  Having already submitted a 115-page brief raising 13 issues, appellate counsel reasonably and wisely decided not to submit a 26- or even an 18-issue brief that probably would have been about 200 pages long.   Although courts have much higher tolerance levels for briefs written by unrepresented litigants, an appellate court would be extremely dismayed to receive a 200-page brief from a lawyer in a case of this nature.  Skilled  attorneys prioritize issues, raising the strongest rather than all issues.  Doing so does not amount to ineffective assistance of counsel.

This court also finds no merit in Burleson's claim that appellate counsel did not "effectively argue" several meritorious issues that he did include in the appellant's opening brief.  Petition, p. 217.  Burleson's argument is made with the benefit of having read the California Court of Appeal's decision, but that decision obviously was not in existence when counsel filed the appellant's opening brief.  Counsel's conduct must be evaluated for purposes of the performance standard of <u>Strickland</u> as of the time of counsel's conduct, <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994), not with the hindsight of knowing how the appellate court analyzed the claims that allegedly could have been better argued.  Further, appellate counsel's decision how to structure an argument is within a trained appellate lawyer's expertise.  Burleson has not shown that counsel made legally incorrect arguments, but only that he would have structured the arguments differently or argued additional authority.  There was neither deficient performance

---

[8]This court was dismayed by the frequency and extent of the distortions of the record by Burleson.  Examples: (1) the discussion at page 198:2-5 does not accurately reflect Judge Sepulveda's response to his letter in light of the letter he wrote, CT 359-360, 367; <u>see also</u> CT 343; (2) the assertion that "there was a constant barrage of pressure," Petition, p. 198, is wholly unsupported by the citation to RT 99-100; (3) the recitation at page 202:21-22 is fabricated; (4) the discussion at page 204:1-3 misleadingly suggests testimony regarding the audiotapes pertains to the videotape that is the subject of that part of the federal habeas petition.  Successful advocates know that distortions/misrepresentations of the record have a spill-over effect, in that they diminish the overall persuasive power of the brief.  While Burleson may believe a misstatement has no consequence other than that the reader does not accept that particular proposition, skilled appellate counsel know better.  Appellate counsel did not fail to provide effective assistance in failing to include these kinds of distortions in his appellate brief.

18

1   nor prejudice resulting from counsel's failure to argue the points he did raise in the manner

2   recommended by Burleson.

3

4   C.      Restriction On Standby Counsel's Communication With Burleson

5           Burleson claims that the trial court improperly prohibited standby counsel "from

6   discussing the case with him and giving him legal advice." Petition, p. 271. This allegedly

7   denied him his rights to due process, assistance of counsel, effective self-representation and

8   equal protection of the law.

9           After the court denied Burleson's second <u>Marsden</u> motion against attorney Strellis,

10  Burleson exercised his right to represent himself. <u>See Faretta v. California</u>, 422 U.S. 806 (1975).

11  Standby counsel was appointed so that counsel could step in and the trial could go forward if

12  Burleson was unable to continue representing himself for any reason. The attorneys appointed

13  as standby counsel, Messrs. Strellis and Krech, previously had been Burleson's defense attorneys

14  and had been formally relieved of their obligation to represent him. The trial court explained

15  to Burleson that standby counsel "'is not an advisory counsel. He doesn't give legal advice of

16  any kind.'" Cal. Ct. App. Opinion, p. 21. The trial court denied Burleson's request for

17  appointment of advisory counsel.

18          Burleson's communications with standby counsel came to the trial court's attention when

19  Burleson complained that the district attorney improperly admonished him and standby counsel

20  to stop talking. Burleson told the court that his counsel was comforting him. "I wasn't seeking

21  advice, nor was I receiving legal advice. He wasn't offering any legal opinion whatsoever." RT

22  4407. After Burleson received clarification that standby counsel had been ordered to decline to

23  provide legal advice because he was no longer Burleson's attorney, Burleson told the court, "I

24  understand your order. And I am telling you that was not occurring. I was not seeking legal

25  advice, nor was he offering legal advice." RT 4409. Burleson asserted he was only seeking

26  comfort and company from another human being: standby counsel "was trying to comfort me

27  by not being a sore thumb in this courtroom, an isolated individual who has no one to talk to.

28

United States District Court
For the Northern District of California

19

United States District Court
For the Northern District of California

It makes me feel guilty. I have no friends. Nobody." RT 4412. Burleson's claim on appeal also was based on his insistence that he was not seeking legal advice. In his federal petition, Burleson's argument is based on his alleged right to receive the legal advice he told the state courts he was not seeking.

The state court of appeal rejected Burleson's contention that the restrictions on standby counsel undermined his right to effective self-representation. The state appellate court ruled that Burleson had no constitutional right to the assistance of counsel once he chose to represent himself. Cal. Ct. App. Opinion, p. 22 (citing McKaskle v. Wiggins, 465 U.S. 168 (1984)). The court further determined that it was proper to appoint standby counsel for the sole purpose of having professional counsel prepared to assume the defense if Burleson became unable to continue representing himself. Id. (citing Locks v. Sumner, 703 F.2d 403, 407 n.3).

The state court of appeal's rejection of Burleson's claim was not contrary to or an unreasonable application of clearly established federal law as set forth by the Supreme Court.[9]

There is no federal constitutional right to advisory counsel or to standby counsel.[10] A criminal defendant can be represented by counsel or he can represent himself, but the law does not require that he be allowed to do both. Although the Supreme Court has noted that it may be wise to appoint standby counsel for a defendant who wishes to waive representation by counsel, a defendant has no constitutional right "to represent himself and have access to 'advisory' or

---

[9]The court stated that Burleson had not identified an actual order prohibiting standby counsel from rendering legal advice. This was incorrect: the trial court had confirmed on the record that, while he did not think he could prevent Burleson from seeking legal advice from anybody, "I can give directions to an officer of the court, and I have to Mr. Krech on several occasions and Mr. Strellis on other occasions, that they are not to be giving you legal advice." RT 4415; see also Resp. Exh. 3 (Appellant's Opening Brief), p. 79. Although the state appellate court's finding there was no order prohibiting the giving of legal advice by standby counsel was an erroneous factual determination, that mistake did not affect the rest of its analysis because the rest of state court of appeal's legal analysis presumed that there was such an order and implicitly found that such an order would have been proper.

[10]Standby counsel and advisory counsel are not the same thing. Standby counsel typically is appointed, as here, so that there is an attorney ready and able to step in to continue presenting the defense if the Faretta defendant becomes unable to continue representing himself. Advisory counsel typically may be appointed to provide advice to a criminal defendant on legal or procedural matters. Neither is constitutionally required.

'consultative' counsel at trial." <u>United States v. Kienenberger</u>, 13 F.3d 1354, 1356 (9th Cir. 1994).  <u>See generally</u> <u>Kane v. Garcia Espitia</u>, 546 U.S. 9 (2005) (<u>Faretta</u> does not clearly establish a right to law library access or any other specific legal aid that must be afforded to a criminal defendant who has chosen to represent himself).  The court can appoint standby counsel without denying the right to self-representation.  <u>See</u> <u>McKaskle</u>, 465 U.S. at 176; <u>see also</u> <u>United States v. George</u>, 85 F.3d 1433, 1439 (9th Cir. 1996) (appointment of co-counsel or advisory counsel).  <u>McKaskle</u> concerns how much interference must be tolerated from standby counsel rather than the amount of help he must be allowed to provide and therefore provides no helpful support to Burleson's position  The fact that a court <u>may</u> appoint standby or advisory counsel does not mean that it must do so.

There was no violation of Burleson's Sixth or Fourteenth Amendment rights in the restriction on his communication with standby counsel.  Because Burleson had no right to advisory counsel, the trial court's order prohibiting standby counsel from giving legal advice did not violate Burleson's constitutional rights.  Despite Burleson's argument to the contrary, there was no <u>ongoing</u> attorney-client relationship when standby counsel was appointed and therefore no interference with it.  The attorney-client relationship had ended when counsel earlier was relieved as defense counsel.  Because standby counsel was Burleson's former attorney, counsel had certain continuing duties as he would to any former client, such as keeping confidential previously learned client confidences.  The very nature of standby counsel is such that the attorney is unable to perform most of the basic attorney functions because doing so (e.g., acting as a zealous advocate for his client) is fundamentally inconsistent with a defendant's exercise of his <u>Faretta</u> right.  There was no ongoing attorney-client relationship and there was no representation by counsel under the Sixth Amendment during the time Burleson was representing himself. He cannot assert a claim based on any interference in the non-relationship. "[W]hatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'"  <u>Faretta</u>, 422 U.S. at 835 n.46.

21

**United States District Court**
For the Northern District of California

The appointment of standby counsel was for the benefit of the administration of justice, not to help Burleson. This was a reasonable decision, especially under the circumstances where the defendant had already gone through several defense attorneys and had changed course on the self-representation/representation by counsel issue. See Petition, pp. 16-25 (procedural history during a two-year period included four Marsden motions, as well as a Faretta motion, followed by a request for appointment of counsel, followed later by another Faretta motion). If Burleson became unable to continue to represent himself, the trial could go forward and the needless consumption of resources and delay that would result from a mistrial could be avoided.

Burleson's equal protection argument also has no merit. Burleson claims he was treated differently based on the exercise of his Faretta right but fails to show he was treated differently from anyone similarly situated. He has not shown that standby counsel even exists in represented cases, let alone that defense counsel or represented clients can obtain legal advice from such counsel. Burleson was not discriminated against based on the exercise of his Faretta right. The court's order was only that the standby counsel not provide him legal advice and, as shown above, he did not have a right to legal advice from counsel while representing himself. If he was seeking companionship (as he represented in state court) he had other people to turn to and, in any event, has not shown that the deprivation of companionship he calls a First Amendment violation, would support habeas relief. On the other hand, if he was seeking legal advice, he had no right to it from these two particular persons who were only present by court order and as officers of the court. He was not precluded from consulting with attorneys other than the two standby counsel. Moreover, the court had not precluded all communications between Burleson and his former attorneys; the trial court indicated it would consider an exception to the ruling if Burleson had a particular need to talk to standby counsel based on counsel's former representation of Burleson. See RT 4409-4410. Burleson's ability to communicate with his former counsel qua former counsel was still potentially available, if he had only asked the trial court.

Finally, even if Burleson was correct on the law and had a right to receive legal advice

from standby counsel, it is doubtful that he would be entitled to habeas relief on this claim. Whether viewed as a claim for which state court remedies have not been exhausted or, more appropriately, a litigant playing fast and loose with the facts, there is a problem here in that Burleson has changed his story. He explicitly denied to the trial court that he was seeking legal advice about the case from counsel while here he insists he needed just that legal advice.

D.      Claim That Sentence Was Not Allowed Under State Law

Burleson argues that the trial court exceeded its jurisdiction by sentencing him under California Penal Code § 1170.12(c)(2)(A) and appellate counsel was ineffective for failing to raise the issue. Petition, p. 231. His sentence was enhanced based on prior convictions that had been obtained on plea agreements entered before the Three Strikes law existed. He argues that using these old convictions to enhance the current sentence was "an unlawful impairment/ violation/breach of contract and offends Due Process under the 14th Amendment to the Constitution of the United States by violating the Doctrine of Equitable Estopp[el]." Petition, p. 232.   Respondent disputes that the claim is exhausted.

The use of the old convictions did not violate any federal constitutional right Burleson possessed.  Due process concerns of fundamental fairness require that a prosecutor keep the promises upon which a defendant relies in entering into a plea agreement.  See Santobello v. New York, 404 U.S. 257, 262 (1971); Johnson v. Lumpkin, 769 F.2d 630, 633 (9th Cir. 1985). Claims of a breached plea agreement are analyzed according to contract law standards of interpretation, such that a court looks to what was reasonably understood by the parties to be the terms of the agreement and whether or not those terms were fulfilled.  See United States v. Kramer, 781 F.2d 1380, 1387 (9th Cir. 1986).  California contracts, including plea bargains, are "'deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws.'"  People v. Gipson, 117 Cal. App. 4th 1065, 1070 (Cal. Ct. App. 2004) (citation omitted).  Burleson's arguments that rely on the contractual nature of the old plea agreements fail because he concedes that the possibility of future use of

United States District Court
For the Northern District of California

the convictions was not part of the plea agreements.  Petition, p. 233.  Because of the absence of any agreement that the convictions could not be used, there is no contract term to enforce. The fact that the trial courts that accepted petitioner's guilty pleas in the earlier proceedings did not warn him of the possibility of future enhancements under a law that did not yet exist did not violate his constitutional rights.  See United States v. Brownlie, 915 F.2d 527, 528 (9th Cir. 1990). (defendant need not be informed of the possibility of a future sentence enhancement).

There is no merit to Burleson's claim that the use of the old convictions violated state law or any federal constitutional right he possessed.  It follows, also, that appellate counsel's failure to present this unmeritorious argument on appeal did not amount to ineffective assistance of counsel.    The claims are not even colorable and therefore may be rejected on the merits even if state court remedies were not exhausted for them.

E.    Evidence Of Prior Acts Of Domestic Violence

Claims VI and VII in the petition concern the use of evidence of prior acts of domestic violence.  Burleson contends that the admission of such evidence violated his right to due process and to be free from ex post facto laws.  He further contends that the jury instructions concerning such evidence violated his right to due process by permitting conviction upon less than proof beyond a reasonable doubt of all elements of the crimes charged.

1.    Evidentiary Rules Regarding Prior Acts Of Domestic Violence

California Evidence Code  § 1101 provides, in relevant part: "(a) Except as provided in this section and Section[] . . . 1109, evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than his or her disposition to commit such an act."

Section 1109 provides, in relevant part that "in a criminal action in which the defendant

24

is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

Evidence Code § 352 permits the court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of under prejudice, of confusing the issues, or of misleading the jury."

To summarize, § 1109 permits a trial court to admit evidence a defendant committed prior acts of domestic violence in order to show his motive, intent and the lack of accidental causes, to commit acts of domestic violence without meeting the similarity or pattern requirements of § 1101(b), and to prove he committed an offense involving domestic violence as long as the evidence is not inadmissible under § 352.

The California Court of Appeal rejected Burleson's ex post facto challenge to § 1109, finding that it "allow[ed] juries in domestic violence trials to hear additional and different testimony than they did before the statute was enacted, [but] it in no way alters the amount or type of evidence required 'in order to convict the offender.'"  Cal. Ct. App. Opinion, pp. 25-26 (distinguishing Carmell v. Texas, 529 U.S. 513, 530-31 (2000))  Section 1109 may have added to the evidence the jury could consider, but it did not lessen the burden to prove guilt beyond a reasonable doubt.  Cal. Ct. App. Opinion, p. 26.

2.    Ex Post Facto Clause

The U.S. Constitution provides that "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts. . . ."  U.S. Const., Art. I, § 10.  In Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798), Justice Chase gave the classic description of ex post facto laws:

> I will state what laws I consider ex post facto laws, within the words and intent of the prohibition.  1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.  2d. Every law that

aggravates a crime, or makes it greater than it was, when committed. 3d Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. <u>4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender.</u>

3 Dall. at 390 (emphasis added).

The fourth <u>Calder</u> category is at issue in Burleson's case.  Although some earlier case law could be read to suggest that <u>Calder</u>'s fourth category of ex post facto laws had been abandoned, the Supreme Court made in clear in <u>Carmell v. Texas</u>, 529 U.S. at 537-39, that no such abandonment had occurred.  The fourth <u>Calder</u> category prohibits both laws that lower the burden of proof and laws that reduce the quantum of evidence necessary to meet that burden, but that does not mean that a state may not change any evidence laws.  For example, a change in a witness competency rule did not violate the Ex Post Facto Clause; the changed rule did not always run in favor of the state and did not necessarily affect, let alone subvert, the presumption of innocence.  <u>See</u> <u>Carmell</u>, 529 U.S. at 533 n.23, 546.  "The issue of the admissibility of evidence is simply different from the question whether the properly admitted evidence is sufficient to convict the defendant.  Evidence admissibility rules do not go to the general issue of guilt, nor to whether a conviction, as a matter of law, may be sustained."  <u>Id.</u> at 546; <u>see also</u> <u>Hopt v. Territory of Utah</u>, 110 U.S. 574, 589-90 (1883).

Even assuming § 1109 was enacted after Burleson committed his crimes, it did not lower the burden of proof for the prosecution and did not change the quantum of evidence necessary to convict him.  The statute permitted the jury to consider additional relevant evidence that was not excluded under § 352 in determining whether the prosecution had met its burden of proof.  Burleson has not shown that § 1109 on its face or as applied in his case altered the burden of proof or the amount of evidence necessary to convict.  <u>Cf.</u> <u>United States v. LeMay</u>, 260 F.3d 1018 (9th Cir. 2001) (similarly structured federal rule on admissibility of evidence of prior misconduct in child molestation cases did not violate due process because Rule 403 (the federal analog to California Evidence Code § 352) functioned as a filter, resulting in the exclusion of

evidence that is so prejudicial as to deprive the defendant of his right to a fair trial).  Section 1109 changed evidence admissibility rules, but that was permissible under <u>Carmell</u> and did not run afoul of the Ex Post Facto Clause.  The state court of appeal identified <u>Carmell</u> as the key Supreme Court authority on the point, and its decision was not contrary to or an unreasonable application of <u>Carmell</u>.

### 3.    Alleged Instructional Error In CALJIC 2.50.02

#### a.    Background

Burleson contends that his right to due process was violated because the jury instructions could have been understood by a jury to permit his conviction based solely upon the fact of his prior acts of domestic violence and without finding each fact necessary to support the conviction beyond a reasonable doubt.

The jury was given these instructions on the use of evidence of the prior domestic violence:

> Evidence has been introduced for the purpose of showing that the defendant engaged in an offense involving domestic violence [on one or more occasions] other than that charged in the case.  [¶] "Domestic violence" means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the defendant has had a child or is having or has had a dating or engagement relationship. . . . [¶]  "Abuse" means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension or imminent serious bodily injury to himself or herself, or another.
>
> If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit [the same or similar type] offense[s].  If you find that the defendant had this disposition you may, but are not required to, infer that [he] was likely to commit and did commit the crime [or crimes] of which [he] is accused.
>
> However, if you find by a [preponderance of the evidence] that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove [beyond a reasonable doubt] that [he] committed the charged offense[s].  The weight and significance, if any, are for you to decide.

CT 2858-2859 (CALJIC 2.50.02).

> Within the meaning of the preceding instruction[s], the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed [crime[s] other than [those] for which [he] is on trial.  [¶] You must not consider this evidence for any

United States District Court
For the Northern District of California

1    purpose unless you find by a preponderance of the evidence that a defendant committed
     the other [crime[s]].

2    CT 2860 (CALJIC 2.50.1). The jury also was instructed on the preponderance of the evidence

3    standard, CT 2863, and was given the following standard reasonable doubt jury instruction:

4        A defendant in a criminal action is presumed to be innocent until the contrary is proved,
         and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled
5        to a verdict of not guilty. This presumption places upon the People the burden of proving
         him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is
6        not a mere possible doubt; because everything relating to human affairs is open to some
         possible or imaginary doubt. It is that state of the case which, after the entire comparison
7        and consideration of all the evidence, leaves the minds of the jurors in that condition that
         they cannot say they feel an abiding conviction of the truth of the charge.
8

9    CT 2873 (CALJIC 2.90).

10       The California Court of Appeal rejected Burleson's claim of instructional error, following

11   the reasoning of People v. Reliford, 29 Cal. 4th 1007, 1009 (Cal. 2003), which had determined

12   that the 1999 version of CALJIC No. 2.50.01 (the sex abuse instruction that paralleled the

13   CALJIC 2.50.02 domestic violence instruction) correctly stated the law. Cal. Ct. App. Opinion,

14   p. 29. Reliford had found no reasonable likelihood under the instructions given that the jury

15   would conclude it could convict appellant of the current offense solely because it found that he

16   had committed a similar prior sex offense.        See Reliford, 29 Cal. 4th at 1015-16. Reliford

17   also had determined that the 1999 version of CALJIC 2.50.01 did not permit jurors to convict

18   based solely on propensity evidence; to the contrary, the instruction explicitly reminded the jury

19   that finding by a preponderance of the evidence that the defendant committed the prior offense

20   was not sufficient by itself to prove beyond a reasonable doubt that he committed the charged

21   crime. Cal. Ct. App. Opinion, p. 29. The California Court of Appeal rejected Burleson's

22   contention that the final paragraph of the 1999 version CALJIC 2.50.02 – i.e., the paragraph

23   above-quoted that begins with the phrase, "However, if you find. . . " -- did not sufficiently

24   dispel the danger of a conviction based on propensity evidence because jurors could misinterpret

25   its meaning. The instruction did not imply by way of a negative pregnant that prior sex offenses

26   proven beyond a reasonable doubt are sufficient to prove the present offense beyond a

27   reasonable doubt, and it was not reasonably likely that a jury could interpret the instruction to

28

                                                    28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

authorize conviction on a lesser standard of proof. Cal. Ct. App. Opinion, pp. 29-30. Lastly, the court determined that, even if the instruction was constitutionally infirm, the error would be harmless beyond a reasonable doubt; the evidence of guilt on the charged crimes was very strong and the prosecutor had not argued that the jury could convict on an improper basis. From this, the court was "satisfied the jury did not simply infer Burleson's guilt from a propensity established by the prior offenses, without regard to whether the prosecution had carried its burden of proving the charged crimes beyond a reasonable doubt." Id. at 30.

b.    Due Process Analysis

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). It is beyond dispute that the Fourteenth Amendment's Due Process Clause requires that a defendant be presumed innocent until proven guilty, that he may only be convicted upon a showing of proof beyond a reasonable doubt, and that the jury be properly instructed that a defendant is presumed innocent until proven guilty beyond a reasonable doubt. Gibson v. Ortiz, 387 F.3d 812, 820 (9th Cir. 2004). "Any jury instruction that 'reduce[s] the level of proof necessary for the Government to carry its burden . . . is plainly inconsistent with the constitutionally rooted presumption of innocence.'" Id. (quoting Cool v. United States, 409 U.S. 100, 104 (1972)). So long as the trial court instructs the jury on the necessity that defendant's guilt be proven beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. See Gibson, 387 F.3d at 825.

In reviewing an ambiguous instruction, the court must inquire whether a reasonable likelihood exists that the jury has applied the challenged instruction in a way that violates the Constitution. See Estelle, 502 U.S. at 72 & n.4; Boyde v. California, 494 U.S. 370, 380 (1990). A determination that there is a reasonable likelihood that the jury has applied the challenged instruction unconstitutionally establishes only that an error has occurred, however. See Calderon

v. Coleman, 525 U.S. 141, 146 (1998).  If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict before granting habeas relief.  See Calderon, 525 U.S. at 146-47.

The jury instructions given at Burleson's trial did not incorrectly describe the burden of proof or permit conviction upon a standard less than proof beyond a reasonable doubt of every element of the charged crimes.  The 1999 version of CALJIC 2.50.02 given at his trial included important cautionary language: "if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses."  When viewed in light of the other instructions given by the court, the 1999 revised CALJIC 2.50.02 given at Burleson's trial made clear that even if the jury found that he committed a prior domestic violence crime by a preponderance of the evidence and drew the inference that he was likely to commit and did commit the crimes of which he was accused, that alone was not sufficient to prove beyond a reasonable doubt that he committed the charged crimes.  There is no reasonable likelihood that the jury applied the challenged instructions to convict Burleson based on a preponderance of the evidence or any standard below proof beyond a reasonable doubt.

The instructions used at Burleson's trial were not the same as, or parallel to, those determined to be constitutionally infirm in Gibson v. Ortiz, 387 F.3d 812.  In Gibson, the jury was instructed with the pre-1999 version of CALJIC 2.50.01 which did not caution the jury that the inference it could draw from the prior offense was not enough to prove guilt on the charged crime beyond a reasonable doubt.  The problem in Gibson was compounded by the use of a modified version of CALJIC 2.50.1 that stated the preponderance of the evidence standard as the burden of proof for prior offenses. The "interplay of the two instructions allowed the jury to find that Gibson committed the uncharged sexual offenses by a preponderance of the evidence and thus to infer that he had committed the charged acts based upon facts found not beyond a reasonable doubt, but by a preponderance of the evidence." Id. at 822.  The Gibson instructions,

United States District Court
For the Northern District of California

carefully followed by the jury, would allow Gibson's conviction based on a finding made on the unconstitutionally low preponderance of the evidence standard. By contrast, Burleson's jury instructions, carefully followed by the jury, would not permit Burleson's conviction based on anything less than proof beyond a reasonable doubt of all elements of the crimes charged. The California Court of Appeal's rejection of Burleson's claim was not contrary to or an unreasonable application of clearly established federal law.

F.     Admission Of Tape Recordings Of Telephone Calls

Burleson next claims that admission of tape-recordings of telephone calls between him and Jane was improper under state law and under the federal wiretap law. Without Burleson's knowledge, Jane had recorded about 24 hours of their telephone calls after he left town. As Burleson describes it, the admission of the recordings allowed the jury to hear "hour upon hour of the most vile and obscene threatening words uttered in petitioner's own voice." Petition, p. 312; see CT 2525-2573 (Burleson's 48-page list of offensive words he uttered on the tapes).

The trial court held a hearing on Burleson's motion to exclude the evidence. Burleson claimed that the tapes should have been excluded because they were made for the wrongful purpose of obtaining leverage in divorce proceedings. Both Burleson and Jane testified at the hearing. Jane testified that her motive in making the tapes was to make a record of what had become of her if she was killed, and she believed Burleson was going to kill her. She denied that the recordings were made to obtain a favorable divorce settlement. There was some testimony that Jane was trying to obtain Burleson's signature on a quitclaim deed to a piece of property after he left town. The state court determined that Burleson had not met his burden to show that Jane taped the calls to obtain leverage for divorce proceedings. The court noted that Jane's testimony showed she made the tapes as evidence in anticipation of being killed by Burleson. The trial court specifically "was not satisfied" that obtaining leverage in the divorce proceeding "was her intent at the time she was taping." RT 554.

On appeal, the California Court of Appeal determined that the admission of the evidence

did not violate state wiretapping law. The state appellate court also rejected Burleson's argument that the state wiretapping law was unconstitutional because it was not as protective as the federal wiretapping law. Although California Penal Code § 632 makes surreptitious recordings of confidential communications criminal and generally inadmissible as evidence, Penal Code § 633.5 creates an exception to the rule for "recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of . . . any felony involving violence against the person." Cal. Penal Code § 633.5. A recording made under that exception is not inadmissible in a prosecution for "any felony involving violence against the person." Id. The California Court of Appeal noted that Burleson had tried to exclude the evidence under state law, under the federal wiretapping law (i.e., Title III of the Omnibus Crime Control and Safe Street Act of 1968, 18 U.S.C. §§ 2510-2520), and by arguing state law was unconstitutional in that it was preempted by federal law.

The part of Burleson's claim that asserts a state law error is beyond the scope of a federal habeas action because the writ can only be issued if there was a violation of the Constitution, laws or treaties of the United States. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

The state court correctly rejected the claim that the admission of the evidence violated the federal wiretap law. Although the admission into evidence in state and federal courts of illegally obtained telephone recordings is not allowed, see 18 U.S.C. § 2515, the evidence here was not illegally obtained. It is not unlawful for a person not acting under color of law to record a communication to which she is a party "unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or any State." 18 U.S.C. § 2511(2)(d). In recognition of the fact that people often act with multiple purposes, section 2511(2)(d) has been interpreted to apply "when it is shown either (1) that the primary motivation, or (2) that a determinative factor in the actor's motivation for intercepting the conversation was to commit a criminal, tortious, or other injurious act." United States v. Vest, 639 F. Supp. 899, 904 (D. Mass. 1986). The state court's rejection of Burleson's motion to suppress implicitly rejected his argument that the recording was made for

United States District Court
For the Northern District of California

a criminal or tortious purpose.  The state trial court, applying the standard in <u>Vest</u>, made the factual findings that the recording was made by Jane to provide evidence about the expected cause of her death and that obtaining leverage in the divorce proceeding was not the primary motivation or determinative factor.  Burleson has not provided any evidence, let alone clear and convincing evidence, necessary to overcome the presumption of correctness of those factual determinations, <u>see</u> 28 U.S.C. § 2254(e).   The state court's factual findings support its determination that the recording was not made for the  purpose of committing a criminal or tortious act.  Furthermore, this court accepts the state court's state law determination (also based on the same factual determination) that a recording made to provide evidence of the expected cause of the recording party's death did not violate state law.  The state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal habeas court.  <u>See</u> <u>Bradshaw v. Richey</u>, 536 U.S. 74 (2005); <u>Hicks v. Feiock</u>, 485 U.S. 624, 629 (1988).  Thus, there was no federal law or state law violation in the recording or the admission of the evidence.  The state court of appeal's rejection of  the claim was not contrary to or an unreasonable application of clearly established federal law.

G.    <u>Failure To Instruct On Lesser Related Offenses</u>

Burleson claims that the state court erred in failing to instruct on lesser related offenses. Specifically, he claims that the court should have instructed on brandishing as a lesser related offense to assault with a deadly weapon, and should have instructed on making harassing telephone calls as a lesser related offense to making terrorist threats.  He further argues that the retroactive application of <u>People v. Birks</u>, 19 Cal. 4th 108 (Cal. 1998) (holding there was no defense right to lesser related offense instructions in California), to his case violated due process "in a manner akin to violation of the prohibition against ex post facto legislation."  Petition, p. 314.  This kind of retroactivity claim is known as a <u>Bouie</u> claim.  <u>See</u> <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 352-54 (1964).

The California Court of Appeal ruled that the trial court properly refused to give the lesser

33

related instructions requested only by the defense.  Although an earlier case, <u>People v. Geiger</u>, 35 Cal. 3d 510 (1984), had required instruction on lesser related offenses upon a defendant's request, <u>Birks</u> had overruled <u>Geiger</u>.  <u>Birks</u> "held that trial courts <u>may not</u> instruct the jury on lesser related offenses absent the consent of both the defendant and the prosecution."  Cal. Ct. App. Opinion, p. 37.  The state appellate court rejected the argument that the <u>Birks</u> decision could not be retroactively applied to Burleson's case.  <u>Birks</u> had specifically declared its holding to be retroactive and stated that due process did not prohibit such retroactivity because the ruling did not expand criminal liability or enhance punishment for conduct previously committed.  Cal. Ct. App. Opinion, p. 37 (quoting <u>Birks</u>, which in turn cited <u>Bouie</u> and a state court case).  The court further observed that a criminal defendant does not acquire a reliance interest in avoiding conviction on the pleadings by the means set forth in <u>Geiger</u>, and that Burleson had not indicated his case would have been conducted differently absent the <u>Geiger</u> rule.  "'With or without <u>Geiger</u>, a criminal defendant has the same incentive to establish, by whatever means, that the prosecution has failed to prove the elements of charged or necessarily included offenses beyond a reasonable doubt.'"  Cal. Ct. App. Opinion, p. 38 (quoting <u>Birks</u>, 19 Cal. 4th at 137).

The California Court of Appeal was clearly correct in its rejection of the claim.  The <u>Bouie</u> rule is confined to changes in substantive criminal law and does not apply to procedural rulings.  <u>Bouie</u> determined that if a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' [the construction] must not be given retroactive effect."  <u>Bouie</u>, 378 U.S. at 354 (citation omitted).  The rationale of <u>Bouie</u> and its progeny rests on the core due process concepts of notice, foreseeability, and the right to fair warning of criminal penalties.  <u>Rogers v. Tennessee</u>, 532 U.S. 451, 459 (2001).  The <u>Bouie</u> rule against judicial expansion of a statute is not an identical twin to the ex post facto rule against retroactive application of legislative changes expanding criminal laws.  <u>See</u> <u>Rogers</u>, 532 U.S. at 458-61.  Thus, the inquiry regarding a judicial decision focuses on whether it impeded fair warning of criminal liability rather than whether it would fall within one of the categories of laws prohibited by the Ex Post Facto Clause.

34

United States District Court
For the Northern District of California

Here, the change in the law worked by <u>Birks</u> was to narrow the circumstances under which lesser related offense instructions had to be given at a jury trial, i.e., such instructions had to be given only if both the defendant and prosecutor requested them.  <u>Birks</u> worked no change in the law of assault with a deadly weapon or brandishing a deadly weapon, and worked no change in the law of making harassing telephone calls or making terrorist threats.  It simply cannot be said that <u>Birks</u> deprived Burleson of fair warning about the penalties for these crimes when he committed them and when he went to trial.  The <u>Bouie</u> rule does not apply here and there was no due process violation.

Burleson also had no independent federal due process right to instructions on the lesser related offenses under the law as set forth by the U.S. Supreme Court.  There is no clearly established rule that a trial court must instruct on all lesser included and lesser related offenses.  Although instructions on lesser included offenses must be given in capital cases, <u>Beck v. Alabama</u>, 447 U.S. 625 (1980), "[t]here is no settled rule of law on whether <u>Beck</u> applies to noncapital cases such as the present one.  In fact, this circuit, without specifically addressing the issue of extending <u>Beck</u>, has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case." <u>Turner v. Marshall</u>, 63 F.3d 807, 819 (9th Cir. 1995), <u>overruled on other grounds</u>, <u>Tolbert v. Page</u>, 182 F.3d 677 (9th Cir. 1999).  The law concerning the duty to give instructions on lesser <u>related</u> offenses is even more unsettled.  "[A]ny finding of constitutional error would create a new rule, inapplicable to the present case under [<u>Teague v. Lane</u>, 489 U.S. 288 (1989).]" <u>Turner</u>, 63 F.3d at 819.  Burleson therefore could not prevail under 28 U.S.C. § 2254(d) on a claim that he had a federal due process right to lesser related offense instructions.

H.    <u>Prosecutorial Misconduct</u>

Burleson claims that the prosecutor engaged in misconduct in his handling of a box of defense files.  The California Court of Appeal described the background of this claim.

Early in the case, when Burleson first decided to represent himself, the judge who then

**United States District Court**
For the Northern District of California

presided over the matter appointed an investigator to receive a box of discovery materials and redact all victim-identifying information before delivering it to Burleson. However, for reasons that are unclear, apparently the box was forwarded to the district attorney's office. A defense investigator testified that when he called Patricia Farrell, an investigator in the district attorney's office, she told him her office was in possession of a box of defense discovery material and they were in the process of redacting certain reports. Farrell did not recall this conversation and denied redacting any defense materials. Based on evidence presented at a hearing on Burleson's motion, the trial court concluded that, although the district attorney's office had come into possession of the defense material, it had returned the box and had not used the material to gain an unfair advantage. The court stated it was 'satisfied that no attorney' in the district attorney's office had read the material and concluded the office's possession of the box did not rise to the level of egregious misconduct warranting dismissal. Nevertheless, to remove any suggestion of impropriety, the court ordered the prosecution to remove investigator Farrell from the case and to have no further communications with her about the case.

Cal. Ct. App. Opinion, pp. 38-39. The California Court of Appeal determined that the trial court did not make an express finding that the prosecutor engaged in misconduct and agreed with the trial court that there was no evidence of prejudice to Burleson's case. See id. at 39-40. The court also found no outrageous misconduct that would show a due process violation under state law. Id. at 40.

The appropriate standard of review for a prosecutorial misconduct claim in a federal habeas corpus action is the narrow one of due process and not the broad exercise of supervisory power. Darden v. Wainwright, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's acts render a trial fundamentally unfair. Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.")

Burleson has offered absolutely no evidence to show that the D.A. investigator's possession of the box of defense materials had any prejudicial effect on the trial. This is not an oversight by an unrepresented habeas petitioner; the judge at the hearing repeatedly pointed out the absence of evidence of prejudice and the defense did not respond with any proof of prejudice at the hearing in state court. The trial court accepted as true that the D.A. had received discovery materials but court was "not satisfied that the district attorney did anything with it," and "was not satisfied that [obtaining the materials] was an orchestrated event. I'm not satisfied that there was any unfair advantage gained."   RT 1197; see also RT 1209-1210. Burleson has not

provided any evidence, let alone clear and convincing evidence, necessary to overcome the presumption of correctness of those factual determinations, see 28 U.S.C. § 2254(e). Although the trial court did not believe there was any malicious intent in the D.A.'s office obtaining the box, the court decided to remove the investigator from the case and to order the prosecutor to have no further communications with her about the case to avoid any potential taint.  See RT 1235-1238.  The court recognized that it had scant evidence of what was in the box and no evidence that the investigator remembered anything from the box but explained that it was the kind of situation where the investigator might realize during trial that she knew something to be a fact but not realize the source of her knowledge.  See RT 1238.  Taking the prophylactic step of removing the investigator from the case avoided that potential problem.  See RT 1238-1242.

Burleson basically invites this court to punish the prosecution by assuming that the prosecutor must have done something wrong when it had the box of defense materials.  Such an approach would be contrary to the Supreme Court's clear directive in Smith v. Phillips 455 U.S. at 219, that the focus must be on the impact of the alleged conduct on the fairness of the trial. However, no evidence was ever presented that the possession of the file by the prosecutor's office had any effect on the fairness of the trial.  The California Court of Appeal's rejection of the claim was not contrary to or an unreasonable application of clearly established federal law.

I.    Denial Of Defense Discovery Requests

Burleson claims that the trial court erred in rejecting his discovery requests for Jane's psychiatric records, to let his expert inspect Jane's phone lines and home, and for a district attorney's notes regarding the tapes of the telephone conversations.  The California Court of Appeal determined that the trial court did not err on any of the three items.  See Cal. Ct. App. Opinion, pp. 43-45.

The constitutional basis for the claims asserted by Burleson is not well articulated but appears to be a blend of the constitutional rights of due process, compulsory process and confrontation.  A state court's evidentiary ruling is not subject to federal habeas review unless

United States District Court
For the Northern District of California

1   the ruling violates federal law, either by infringing upon a specific federal constitutional or

2   statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by

3   due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d

4   918, 919-20 (9th Cir. 1991).  There is no Brady material question as to at least the first two

5   discovery items because the materials were not in the possession or control of the prosecution.

6   See Brady v. Maryland, 373 U.S. 83, 87 (1963) ("the suppression by the prosecution of evidence

7   favorable to an accused upon request violates due process where the evidence is material either

8   to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

9          The Sixth Amendment to the United States Constitution gives a criminal defendant the

10  right "to have compulsory process for obtaining witnesses in his favor" and to "be confronted

11  with witnesses against him."  The right to compulsory process is not absolute.  Taylor v. Illinois,

12  484 U.S. 400, 410 (1988).  The Sixth Amendment right to present relevant testimony may, in

13  appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.

14  Rock v. Arkansas, 483 U.S. 44, 55 (1987); see Perry v. Rushen, 713 F.2d 1447, 1453-54 (9th

15  Cir. 1983) (no violation of compulsory process to prohibit evidence of third party identity

16  because evidence collateral and state interest in evidentiary rule overriding).  With these

17  standards in mind, the court considers each of the discovery problems.

18

19          1.    Psychiatric Records

20          The trial court denied Burleson's motion to obtain Jane's psychiatric records after

21  reviewing the subpoenaed records in camera.  The motion was denied without prejudice to

22  Burleson renewing the motion at trial.  He didn't.  The state court of appeal determined that the

23  claim of error on appeal was waived because Burleson failed to renew the motion at trial.  The

24  state appellate court rejected Burleson's argument that pretrial access was necessary to vindicate

25  his federal constitutional rights to confront and cross-examine the complaining witness or

26  receive a fair trial, relying on a state court decision that trial courts are not required to afford

27  criminal defendants pretrial access to privileged psychotherapy records.  Cal. Ct. App. Opinion,

28

pp. 43-44 (citing <u>People v. Hammon</u>, 15 Cal. 4th 1117, 1119 (Cal. 1997)).

The refusal to provide the materials to Burleson before trial did not result in a violation of his federal constitutional rights.  When one reads the record and Burleson's petition, one of the impressions that comes through is that Burleson may have been using his criminal case to inflict further harm on Jane -- that he wasn't quite done with her yet.  His request to see her psychiatric records exemplifies that problem.  He states that Jane's mental state was in issue because she testified she earlier had testified favorably to him at his 1994 parole revocation hearing -- when she said that Burleson had <u>not</u> harmed her -- due to her history of psychiatric disorder.  Burleson does not explain how Jane's psychiatric records would have aided him in any way relating to this point of testimony.  Burleson doesn't explain how it would have helped him to show that Jane did not have a recorded mental health problem at the time as one can have an untreated problem.  On the other hand, if his goal was to show that she did have a problem, she admitted that.  He also does not explain how it would have aided him in examining Dr. Samuel Benson during trial.  His paltry showing of need is greatly outweighed by the extraordinarily intrusive nature of the request.

### 2.   Home Visit

The trial court denied Burleson's request to permit his expert to inspect the phone lines in Jane's home and videotape the interior and exterior of the house.  Jane objected and declared that she no longer owned the telephone she had used to make the tapes.  The California Court of Appeal determined that the trial court acted within its discretion in denying the request, especially in light of the declaration that Jane no longer had the telephone and "given the vague justification for Burleson's videotaping request"  Cal. Ct. App. Opinion, p. 44.  That is, he had not demonstrated a sufficient plausible justification and good cause for the intrusion into the victim's fundamental privacy right in her home.  <u>Id.</u>

The state court did not err in rejecting the discovery request.  As Burleson had described it, a lot of what his expert was going to be doing depended on access to the telephone that had

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

been in use when the tapes were made. <u>See</u> RT 2144-2145. He even wanted the expert to be allowed to take the telephone for testing. But the telephone was gone. Burleson has not shown how the testing for electro-magnetic fields was going to be of any value without the telephone. Moreover, he has not shown how his proposed testing was going to be accomplished or was going to be of any value without any evidence as to the particular conditions in place at the time of any recording. That is, there is no showing that the tester could conduct any useful tests of signal interference if he did not know where electricity-using devices were and whether they were in use when telephone calls were being recorded.

Burleson also misrepresented the record in stating that the trial court granted access and later reversed itself. <u>See</u> Petition, p. 325:13-117, p. 326:1. The statement he quotes is taken out of context: the court made the statement as a preface to its comment that it needed to explore the extent of the intended intrusion and that it needed to hear from Jane on the issue. As Burleson well knows, courts don't make rulings before hearing evidence and before hearing argument. Burleson's argument that there was a <u>Brady</u> violation is meritless as the material was not sought from the government but from a private party.

Finally, as respondent notes, Burleson's repeated threats to harm and kill Jane provided further reason to disallow the videotaping of the home (and the detailed information that it could provide about layout) by someone working for Burleson. Like the request to obtain Jane's psychiatric records, the request to videotape the interior and exterior of the home has an element of harassment.

       3.     <u>District Attorney's Notes About The Tapes</u>

Burleson claimed he was denied access to the deputy district attorney's notes about the audiotapes, although he never actually filed a motion for the discovery. "[D]uring an evidentiary hearing on Burleson's motion to suppress the audiotapes, a deputy district attorney testified he had listened to the tapes and made notes to indicate where on the tapes certain statements were made. Burleson interrupted his questioning of the attorney to declare, 'I would like discovery

United States District Court
For the Northern District of California

1  on that.'  The court acknowledged Burleson's 'desire to have' the notes but never ruled on

2  whether such discovery would be permitted.  Beyond stating he 'would like discovery,' it appears

3  Burleson took no further steps to obtain the notes."  Cal. Ct. App. Opinion, p. 44.  The appellate

4  court deemed the issue waived on appeal because Burleson failed to obtain a ruling from the trial

5  court for review.  Id.

6          This court agrees with the state court that there was no actual request for the materials,

7  and therefore no error in failing to grant an unmade request.  See RT 2735.   It was Burleson's

8  lack of skill as an advocate, not the trial court's error, that prompted him to fail to make a motion

9  for the materials, as opposed to merely making an observation during examination of a witness.

10  Furthermore, the alleged reason for requesting the documents was wholly speculative.  Burleson

11  claims he wanted to show the tapes were altered and were not a continuous recording, but his

12  request to obtain the district attorney's notes is based on the wholly unsupported speculation that

13  the district attorney's office fabricated evidence to prosecute him.  Burleson admitted that he

14  made the abusive and threatening statements that were recorded, although he claimed that the

15  tapes had been altered to show what had prompted the outbursts and that Jane was not actually

16  fearful at hearing his lengthy diatribes, see RT 2795, notwithstanding his numerous threats to

17  kill her, her mother and her father as well as his graphic descriptions of how he would kill each

18  of them.  The prosecutor did not contend that the tapes were a continuous recording of the

19  telephone calls; he acknowledged that Jane had recorded only parts of some conversations,

20  sometimes because of equipment problems and sometimes when the conversations had nothing

21  to do with Burleson's threats.  Lastly, it appears that the notes would have been protected work

22  product.  See Morris v. Ylst, 447 F.3d 735, 742 (9th Cir. 2006).   There was no constitutional

23  error here.

24

25  J.      Restitution Order

26          Burleson was ordered to pay restitution of about $6,236.92 to Jane for various security

27  related expenses.  Jane sought and received restitution for amounts she spent to "(1) purchase

28                                                    41

United States District Court
For the Northern District of California

1   and install a home security system, (2) pay monthly maintenance fees for the security system,

2   (3) change the locks on her home, (4) purchase a handgun, (5) attend a weapons safety course,

3   (6) pay fees necessary to obtain a concealed weapons permit, (7) pay for food and lodging and

4   the repainting of her car, after she learned Burleson 'had put a "contract" out on [her] life' and

5   fled her home, (8) pay collect telephone calls from Burleson, and (9) purchase a new mattress

6   to replace one damaged and later taken by Burleson."  Resp. Ex. 6A (Cal. Ct. App. Opinion #

7   2, pp. 1-2.  He claimed on appeal, as he does here, that the amounts were not allowed under the

8   restitution statute, California Penal Code § 1202.4, and that hearsay was improperly considered

9   by the trial court.

10      The California Court of Appeal rejected Burleson's argument that California Penal Code

11   § 1202.4 did not allow restitution for items spent related to crimes for which he was never

12   charged or convicted.  See Resp. Ex. 6A, p. 3.  "[B]ased on the plain language of subdivision (f),

13   the court must order full restitution for all economic losses a victim has suffered 'as a result of

14   the defendant's conduct (§ 1202.4, subd. (f), italics added) unless it has an unusually compelling

15   reason not to do so.  The statute does not limit the amount of restitution to losses caused by

16   criminal conduct for which the defendant was convicted."  Resp. Exh. 6A, p. 3.  "These expenses

17   were related to the crimes against Jane for which Burleson was convicted; indeed, they resulted

18   from what the trial court reasonably concluded was a pattern of ongoing conduct by Burleson

19   designed to keep Jane living in a state of fear."  Id. at 4.[11]  The state court's interpretation of state

20   law is binding on this court in consideration of the habeas petition.  Because it has been

21   determined that the restitution amounts were allowed under state law, there was no order in

22   excess of that allowed by state law and no federal due process violation.  See Walker v. Endell,

---

24   [11]At the restitution proceedings, the trial court observed that there was a reasonable basis
25   for Jane's expenditures based on Burleson's conduct. "[T]he conduct of this particular Defendant
     was on an ongoing basis to put Ms. Elliot in a state of fear.  Fear that he was either going to
     return or he was going to have people return to harm her.  [¶]  The terrorist threats were an
26   ongoing thing.  They were an ongoing thing to the extent that there is always a – you pardon the
     expression – a barb out there.  It doesn't make any difference where I am, how I am situated, you
27   will always be in fear of me, of things that I can do."  RT 6939.

28                                                      42

850 F.2d 470, 476 (9th Cir. 1987).  Burleson's particular arguments about the award of the costs of a security system, a mattress and phone calls also are state law claims for which relief is not available in a federal habeas action.

The state appellate court also rejected Burleson's argument that he was denied due process by the use of allegedly inadmissible hearsay to determine the restitution matter.  The court doubted that the statements were even hearsay "since, in this restitution hearing, they were offered not for the truth of the matter asserted, but as proof of Jane's state of mind." Id.  Even if the information was hearsay, Burleson had failed to make a hearsay objection in the trial court and the defense actually had elicited almost all the hearsay evidence.  Id.  Burleson has not disputed that the hearsay about which he complains was introduced by the defense.  He has not shown that the admission of the evidence violated his right to due process, as he must to obtain federal habeas relief.

Burleson has not shown that the state court of appeal's rejection of his claims regarding the restitution order was contrary to or an unreasonable application of clearly established federal law, as set forth by the Supreme Court.  He is not entitled to the writ on this claim.

K.    Petitioner's Objections To State Habeas Proceedings

Lastly, Burleson complains about the reception his state habeas petition received in the Contra Costa County Superior Court.  Errors in the state post-conviction review process are not addressable through federal habeas corpus proceedings.  See Ortiz v. Stewart, 149 F.3d 923, 939 (9th Cir. 1998); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997).

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  The clerk shall close the file.

One final administrative matter: Having read the 348-page petition (in which the legal claims did not appear until page 157), this court concludes that the length of Burleson's petition

was grossly excessive for the legal issues and circumstances of this case.  Although this court has endured the fat brief, the next court to entertain Burleson's claims may wish to consider this court's observation before permitting a lengthy brief.

      IT IS SO ORDERED.

DATED: November 15, 2007

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California